**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 08-M-97 |
| | ) | |
| v. | ) | |
| | ) | Mag. Judge Michael T. Mason |
| Matthew Francis Nolan, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER GRANTING IN PART**
**AND DENYING IN PART REQUEST FOR EXTRADITION**

The Republic of Costa Rica has requested the extradition of Matthew Francis

Nolan ("Nolan") pursuant to the Extradition Treaty with Costa Rica, Oct. 11, 1991, S.

Treaty Doc No. 98-17 (1982) and related diplomatic notes (the "Treaty"). According to

that request, Nolan is wanted for trial on the charges of: (1) Use of a False Document,

in violation of Article 365 of the Costa Rican Penal Code, (2) Aggravated Homicide, in

violation of Article 112, paragraphs 3 and 7 of the Penal Code, and (3) Aggravated

Kidnapping, in violation of Article 192, paragraph 2 of the Penal Code. These charges

relate to the death of Robert Curtis Cohen ("Cohen"). The government contends that

the totality of evidence before this Court establishes probable cause to believe that

Nolan committed the alleged offenses. Nolan contests his extradition on the issue of

probable cause. He further argues that the extradition request does not comply with the

terms of the Treaty, and that certain documents submitted in support of that request are

untimely and unauthenticated, and therefore inadmissible.

This Court has carefully considered the relevant Treaty provisions, the exhibits

submitted by Costa Rica in support of the extradition request, the parties' written

submissions [23, 15, 22, 24, 33, 34], and the arguments made by counsel during the extradition hearing. For the reasons set forth below, we find that there is competent evidence to sustain a finding of probable cause as to the charge of Use of a False Document. However, we find that the totality of evidence falls short of establishing probable cause to believe that Nolan committed the crimes of Aggravated Homicide and Aggravated Kidnapping.

## I. LEGAL STANDARD

Extradition is a diplomatic process governed by the provisions of the federal extradition statute and the relevant treaty. 18 U.S.C. §§ 3181 *et seq.* Extradition is only proper where, as here, there is a treaty in force between the requesting country and the United States. 18 U.S.C. § 3181. The country seeking extradition – in this case Costa Rica – must submit a request for extradition through proper diplomatic channels.

The authority of a magistrate judge serving as an extradition judicial officer "is limited to determining an individual's eligibility to be extradited, which is done by ascertaining (1) whether the crime is an extraditable offense under the subject treaty and (2) whether probable cause exists to sustain the charge." *In re Extradition of Sainez*, 2008 U.S. Dist. LEXIS 9573, *8 (S.D. Cal. Feb. 8, 2008) (citation omitted); *see also* 18 U.S.C. §3184 (providing for extradition "[i]f, on such hearing, [the court] deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention."). Thus, a request for extradition will be granted where: (1) the judicial officer has jurisdiction to conduct an extradition proceeding, (2) the court has jurisdiction over the fugitive, (3) the person before the court is the fugitive named in the request for

2

extradition, (4) there is an extradition treaty in full force and effect, (5) the crimes for which surrender is requested are covered by that treaty, and (6) there is competent legal evidence to support the finding of probable cause as to each charge for which extradition is sought. *In re Extradition of Garcia*, 188 F. Supp. 2d 921, 925 (N.D. Ill. 2002) (citing *Fernandez v. Phillips*, 268 U.S. 311, 312, 45 S.Ct. 541, 542 (1925)). If the magistrate judge determines that the offenses charged are within the treaty's terms and probable cause exists, he is to certify the matter to the Secretary of State, who has sole discretion to determine if the extradition should proceed. *Eain v. Wilkes*, 641 F.2d 504, 508 (7th Cir. 1981). Should the magistrate judge determine that "the offense charged is not within a treaty's terms or find an absence of probable cause, the magistrate cannot certify the matter to the Secretary of State for extradition." *Id.*

## II.    BACKGROUND

### A.    Procedural History

On March 13, 2008, the United States filed a Complaint for Provisional Arrest with a View Towards Extradition of Nolan. Based on that complaint, Magistrate Judge Martin C. Ashman issued a warrant for Nolan's provisional arrest. On February 26, 2009, the FBI arrested Nolan in Chicago. Since that time, Nolan has been detained at the Metropolitan Correctional Center (the "MCC") pursuant to Article 12 of the Treaty.

The United States, acting on behalf of the Republic of Costa Rica, filed a formal request for extradition of Nolan on May 21, 2009. [23]. That filing includes a memorandum of law, Costa Rica's initial request for Nolan's extradition and various documents submitted by Costa Rica in accordance with the Treaty. Nolan opposed the

government's request, and filed a motion to dismiss the extradition complaint [15].

This Court conducted a hearing on June 10, 2009 to determine if the evidence of criminality presented by the Republic of Costa Rica is "sufficient to sustain the charge under the provisions of the proper treaty or convention." 18 U.S.C. §3184. Following the initial hearing, the government moved to supplement the record. [26]. We granted the government's motion over Nolan's objection on July 2, 2009, and authorized the government to submit additional materials received from Costa Rica in further support of the extradition. This Court conducted a continued hearing on July 14, 2009 and July 21, 2009. On July 29, 2009, the parties submitted their post hearing briefs.

## B.    Evidence before the Court

Costa Rica's initial submission includes a warrant for international arrest prepared by Lic. Jose Alexander Gomez Moreno, Criminal Judge in the Criminal Court of the First Judicial Circuit of the Atlantic Zone ("Judge Moreno") and signed by Lic. Andrian Molino Elizondo of the Criminal Court of Pavas ("Judge Elizondo"), dated February 17, 2006. (B. 36-41).[1] It also includes a formal extradition request dated March 20, 2009. (B. 90-101). In that request, Judge Moreno summarizes the results of an investigation conducted by Costa Rican authorities, outlines the charges for which extradition is sought, sets forth relevant portions of Costa Rica's Penal Code, and identifies various documents submitted for this Court's consideration in connection with

---

[1]This Court has included various record cites in our Opinion to assist the parties in identifying the specific fact or allegation that supports each of our conclusions. Materials included in Costa Rica's initial submission are identified by a Bates-number ("B."). Materials included in Costa Rica's supplemental submission, discussed below, are identified by "SS" and "SE."

the extradition request. (*Id.*). Also included is an investigation summary prepared by the "Prosecutors of the Assistant Prosecutor's Office against Organized Crime." (B. 1 - 22). That summary includes abstracts of statements from witnesses interviewed during the course of the investigation, and identifies various documents submitted to this Court. (B. 23-35).

Costa Rica's initial submission also includes a statement from Lic. Rodrigo Salas Rojas, Office of the Assistant Prosecutor against Organized Crime ("Prosecutor Rojas") requesting an international warrant for Nolan's arrest. (B. 42-43). This is followed by an "International Capture Order Update" in case number 06-006285-647-TP against Nolan (B. 44-46) and a report from the Judicial Investigation Organization, Department of Criminal Investigations initially prepared for Assistant Prosecutor Ligia Cerdas Solano ("Prosecutor Solano"), as well as flight records, various police and medical reports and other related documents. (B. 47-87). Finally, the initial extradition submission includes a May 11, 2007 ruling from the Court of the First Judicial Circuit of the Atlantic Zone, acquitting Anabell Chacon Sanchez ("Sanchez") of Cohen's murder and kidnapping, declaring Luis Alonso Douglas Mejia ("Mejia") the "principal responsible perpetrator" of the crimes of aggravated homicide and kidnapping of Cohen, and sentencing Mejia to twenty-seven years imprisonment for those crimes. (B. 88-89).

On July 1, 2009, the government submitted additional materials received from Costa Rica in further support of the extradition request. The supplemental record includes a statement from Prosecutor Rojas requesting an extension of this matter in order to submit additional evidence. (SE. 1-5). That evidence, which is summarized in Prosecutor Rojas' statement and attached thereto, predominately consists of telephone

records and a related analysis for two numbers - "378-1326" and "380-9763." Costa

Rica also provided a letter from Cohen to his attorney Tanya Plaut (SS. 52-53), and

various emails that reflect communications between Cohen (the victim) and Nolan.

(SS. 54-71). Finally, the supplemental record includes the United State's Department

of Justice's response to the Letter of Rogatory request by Costa Rican authorities (the

"DOJ Response"). (SS. 73-85). That response incorporates a summary of an

investigation into Cohen's death conducted by the FBI.

Nolan submitted three pieces of additional evidence in opposition to the

extradition request: a copy of the translated portion of Costa Rica's initial submission,[2] a

copy of a rental car agreement, and a letter from his wife's physician. As discussed

below, this Court has limited discretion to consider evidence offered in opposition to an

extradition request. *In re Extradition of Singh*, 170 F. Supp. 2d 982, 993 (E.D. Cal.

2001). "An accused in an extradition hearing has no right to contradict the demanding

country's proof or to pose questions of credibility as in an ordinary trial, but only to offer

evidence which explains or clarifies that proof." *Eain,* 641 F.2d at 511 (citation omitted).

The government also submitted additional evidence. It asks this Court to

consider a letter from Nolan to his wife dated March 10, 2009 and evidence of a

planned escape discovered by MCC officials during a March 11, 2009 search of Nolan's

cell.

---

[2]This Court cannot determine why Nolan relies on a duplicate translation of the materials submitted by Costa Rica. In his brief, Nolan cites to his exhibit, the pages of which are identified with a "CR" number, as opposed to Costa Rica's extradition packet. The CR number does not correspond to the Bates-number of the initial submission. The government cites to the Bates-number. In order to limit further confusion, we refer to the documents included in the initial submission by the applicable Bates-number, rather than the CR number.

## III.    PRELIMINARY FINDINGS

### A.    Authority of the Judicial Officer

The extradition statute authorizes federal magistrate judges to hear and decide extradition requests if "authorized . . . by a court of the United States." 18 U.S.C. § 3184; *see also Austin v. Healey*, 5 F.3d 598, 601-02 (2nd Cir. 1993) (rejecting challenge to magistrate judge's authority to conduct an extradition hearing without specific delegation of authority for that particular case). Nolan does not contest this Court's jurisdiction, and we have the requisite subject matter jurisdiction over this extradition proceeding.

### B.    Jurisdiction Over the Fugitive

The extradition statute provides for this Court's jurisdiction over any person "found within [t]his jurisdiction." 18 U.S.C. § 3184. Nolan was arrested within the jurisdiction of the Northern District of Illinois. Moreover, Nolan does not dispute that he is the individual identified in the extradition request. Accordingly, this Court has the requisite personal jurisdiction to determine the extraditability of Nolan pursuant to 18 U.S.C. § 3184. *See also In re Extradition of Ortiz*, 444 F. Supp. 2d 876, 882 (N.D. Ill. 2006).

### C.    Existence of an Extradition Treaty

Extradition is proper where there is a treaty or convention for extradition in force between the requesting country and the United States. 18 U.S.C. §§ 3181, 3184; *see also In re Extradition of Kam-Shu*, 477 F.2d 333, 339 n. 9 (5th Cir. 1973) ("Extradition treaties should be construed liberally, but absent a treaty or specific authority in a treaty

7

the United States generally will not extradite a fugitive.") (quotation omitted). The United States has submitted a declaration from Susan Torres, an Attorney Advisor in the Office of the Legal Adviser for the Department of State, attesting that there is a treaty in full force and effect between the United States and Costa Rica. Nolan has not challenged the validity or application of the Treaty, and the Court has no reason to suspect its legitimacy. Accordingly, we find that there is a valid extradition treaty in full force and effect between the United States and Costa Rica.

### D. Crimes Covered by the Treaty

Next, we must determine if the charged offenses provide a basis for the accused's extradition. The Treaty allows for extradition of "persons found in the territory of one of the Contracting Parties who have been charged with, are being tried for, or have been found guilty of an extraditable offense in the Requesting State." (Art. 1). Article 2 of the Treaty defines offenses as "extraditable" if the alleged criminal conduct "may be punished under the laws of both [the United States and Costa Rica] by deprivation of liberty for a maximum period of more than one year or by any greater punishment." Here, Costa Rica requests extradition for: (1) Use of a False Document in violation of Article 365 of the Penal Code, (2) Aggravated Homicide, in violation of Article 112, paragraphs 3 and 7 of the Penal Code, and (3) Aggravated Kidnapping, in violation of Article 192, paragraph 2 of the Penal Code.

Each of the charged offenses is extraditable. Pursuant to Article 365, "one to six years of prison shall be imposed on any person using a false or adulterated document." The Aggravated Homicide charge falls under Article 112 which provides:

Twenty to thirty five years of prison shall be imposed on any person who kills:

8

1) An ascendant, descendant or spouse, blood brother or sister, concubine or domestic partner if they have procreated one or more offspring in common and have cohabitated for at least two years prior to the perpetration of the act.
2) Any member of the Supreme Powers in relation to their functions.
3) With treachery (killing by surprise) or extreme cruelty.
4) Using insidiously administered poison.
5) Using ideal means to create a common hazard.
6) For preparing, facilitating, executing or hiding another crime or to ensure its results or to seek impunity for himself or another or for not having accomplished the result sought in committing another crime.
7) For a price or promised remuneration.

Article 192 establishes the elements for Aggravated Kidnapping:

Two to ten years of prison shall be imposed on any person that would deprive another of his personal freedom, if perpetrated:

1) Against an ascendant, descendant, spouse, sibling or against a public official;
2) Using acts of violence or to satisfy revenge or resulting in serious harm to the victim's health;
3) Lasting more than five days; and
4) by abuse of authority.

(B. 6-7). Accordingly, pursuant to Costa Rica's Penal Code, these offenses are each punishable by imprisonment for at least one year. (B. 7-8).

We must also determine if the conduct involved in the foreign offenses would be criminal under United States law. "In assessing the duality of the crimes charged in an extradition proceeding, the Court may refer to either the federal or state law of the United States." *In re Ortiz*, 444 F. Supp. 2d at 883 (citing *Cucuzzella v. Keliikoa*, 638 F.2d 105, 107 (9th Cir. 1981)). Moreover, "[t]he law does not require that the name by which the crime is described in the two countries shall be the same . . . It is enough if the particular act charged is criminal in both jurisdictions." *Collins v. Loisel*, 259 U.S. 309, 312, 42 S.Ct. 469, 470-71 (1922). The Costa Rican offense of Use of a False

9

Document corresponds to the offense of possession of a false identification document as stated in 18 U.S.C. § 1028, or forgery under 720 ILCS 5/17-3. The offense of Aggravated Homicide corresponds to the offense of murder as stated in 18 U.S.C. §1111 or 720 ILCS 5/9-1, and the offense of Aggravated Kidnapping corresponds to the offense of kidnapping as stated in 18 U.S.C. § 1201 or 720 ILCS 5/10-2(a). Accordingly, we find that the crimes for which extradition is sought are covered under the terms of the Treaty.

## IV. PROBABLE CAUSE

Having found that the charged offenses are within the Treaty's terms, we must determine if there is competent legal evidence to support a finding of probable cause as to each of the three charges for which extradition is sought. *See, e.g. In re Garcia*, 188 F. Supp. 2d at 925 (citations omitted). Nolan contests Costa Rica's ability to establish probable cause for any off the offenses underlying the request for extradition, as well as the admissibility of certain evidence placed before this Court.

### A. Standard for Determining the Sufficiency of Evidence

The hearing contemplated under the extradition statute is not a trial on the merits of the charges, but is more in the nature of a preliminary hearing. *Bovio v. United States*, 989 F.2d 255, 259 (7th Cir. 1993). This Court is not required to determine if Nolan is guilty "but merely whether there [i]s competent legal evidence which would justify his apprehension and commitment for trial if the crime had been committed in Illinois." *In re Ortiz*, 444 F. Supp. 2d at 884 (citing *Collins*, 259 U.S. at 314-15, 42 S.Ct. at 471); *see also Gill v. Imundi*, 747 F. Supp. 1028, 1038 (S.D.N.Y. 1990) ("[T]he

hearing before the extradition magistrate does not determine the guilt or innocence of the accused but rather represents a judgment whether there is competent evidence that would support a reasonable belief that the subject of the proceedings was guilty of the crimes charged.") (quotations omitted). Competent evidence for purposes of an extradition proceeding "is not necessarily evidence competent to convict." *Esposito v. Adams*, 700 F. Supp. 1470, 1476 (N.D. Ill. 1988) (quotations omitted). Rather, probable cause will be found where there is evidence "sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt." *In re Extradition of Guillen*, 1991 U.S. Dist. LEXIS 21839, *22 (N.D. Ill. July 12, 1991) (citing *Sindona v. Grant*, 619 F.2d 167, 175 (2nd Cir. 1980)).

The probable cause standard is a "flexible, practical common-sense one." *U.S. v. Hayes*, 236 F.3d 891, 894 (7th Cir. 2001). Accordingly, "[i]n making this determination, courts apply a 'totality of the circumstances analysis' and 'make a practical, common sense decision whether, given all the circumstances . . . there is a fair probability' that the defendant committed the crime." *In re Ortiz*, 444 F. Supp. 2d at 884 (quoting *In re Extradition of Okeke,* 1996 U.S. Dist. LEXIS 22379 at *5 (D.N.J. Sept. 5, 1996)). The Federal Rules of Evidence and the Federal Rules of Criminal Procedure do not apply to extradition proceedings. *Bovio*, 989 F.2d at 259 n. 3. Hearsay evidence may be considered and may form the basis for a finding of probable cause. *Collins*, 259 U.S. at 317, 42 S.Ct. at 472. However, the evidence offered in support of extradition must be "competent and adequate." *Bingham v. Bradley*, 241 U.S. 511, 517, 36 S.Ct. 634, 637 (1916). Thus, when "presented with evidence through

affidavits, the court may conclude, on a review of the affidavits submitted that there are insufficient indicia of reliability or credibility to establish probable cause." *In re Ortiz*, 444 F. Supp. 2d at 884 (quotations omitted). Similarly, when an extradition request consists of "mere conclusory allegations unsupported by substantive evidence, extradition will be denied." *Id.* (citing *United States v. Fernandez-Morris,* 99 F. Supp. 2d 1358, 1366 (S.D. Fla. July 30, 1999)).

 A realtor's right to introduce evidence in an extradition proceeding is limited. He "is not entitled to contradict the demanding country's proof or pose questions of credibility, but is limited to offering evidence which explains or clarifies that proof." *In re Guillen*, 1991 U.S. Dist. LEXIS 21839, *22 (N.D. Ill. July 12, 1991); *see also Esposito*, 700 F.Supp. at 1477 (declining to consider the credibility and motives of witnesses). Allowing the admission of explanatory evidence is intended to "afford an accused person the opportunity to present reasonably clear-cut proof which would be of limited scope and have some reasonable chance of negating a showing of probable cause." *In re Extradition of Ben-Dak*, 2008 WL 1307816, *4 (S.D.N.Y. Apr. 11, 2008) (quotations omitted). However, the court must ensure that the extradition proceedings are not converted into a "dress rehearsal trial." *Jhirad v. Ferrandina*, 536 F.2d 478, 484 (2nd Cir. 1976), cert denied, 429 U.S. 833 (1976). For this reason, evidence attacking the credibility of a witness is not permissible as issues of credibility are to be resolved at trial. *In re Extradition of Mazur,* 2007 U.S. Dist. LEXIS 52551, *60 (N.D. Ill. July 20, 2007) (citations omitted). Evidence that "obliterates" probable cause may be considered. *In re Mazur*, 2007 U.S. Dist. LEXIS 52551 at *60 (citations omitted).

## B.    Nolan's Procedural Objections

Before determining if the evidence presented by the Republic of Costa Rica is sufficient to establish probable cause to believe that Nolan committed the three alleged offenses, we must consider Nolan's objections regarding Costa Rica's compliance with the Treaty and the admissibility of certain evidence. Nolan argues that Costa Rica failed to provide a charging document as required under the terms of the Treaty. Nolan also argues that Costa Rica's supplemental submission does not comply with the extradition statute, summaries of witness statements must be excluded as unreliable hearsay, and evidence of his alleged consciousness of guilt is inadmissible. We consider each of these challenges in turn.

### 1.    Absence of a Charging Document

Nolan argues that the extradition request must be denied because Costa Rica did not provide a proper charging document. Where, as here, the request for extradition relates to a person who has not yet been convicted, the Treaty requires that it be accompanied by:

> (a)    A copy of the charging document, or any equivalent document issued by a judge or judicial authority; and
>
> (b)    Such evidence as in accordance with the laws of the Requested State, would be necessary to justify the apprehension and commitment for trial of the person sought if the offense had been committed there.

(Treaty Art. 9(4)(a)). The extradition packet includes a warrant issued by Judge Elizondo. (B. 36-41). The government posits that Judge Elizondo's warrant is an acceptable charging document.

The express language of the Treaty does not preclude the government's reliance

on the warrant issued by Judge Elizondo. It requires the requesting country to submit a "charging document, or any equivalent document issued by a judge or judicial authority." (Treaty Art. 9 §(4)). Other courts have found that an arrest warrant may be considered a charging document. *See, e.g. In re Rovelli*, 977 F. Supp. 566, 568 (D. Ct. July 24, 1997) (noting that "[t]he arrest warrant issued by the Italian authorities constitutes a charging document under Italian law."); *In re Sainez,* 2008 U.S. Dist. LEXIS 9573, *23-24 (finding "the Mexican arrest warrant [is] the charging instrument under Mexican legal procedure."). Nolan concedes that an arrest warrant may suffice as an appropriate charging document, but only in "civil law countries." Nolan argues that there is no basis to find that Costa Rica is a civil law country or that a warrant suffices as a charging document under Costa Rican law. We disagree.

The United States Department of Justice, Office of Justice Programs, Bureau of Justice Statistics has compiled the World Factbook of Criminal Justice Systems which includes a report and narrative description of the Costa Rican criminal justice system. http://www.ojp.usdoj.gov/bjs.pub/ascii/wfbcjcos.txt.[3] According to that report, Costa Rica "closely follows the Civil Law system." The Department of Justice report also outlines the procedure under which an accused may be arrested and taken into custody. In Costa Rica, formal investigation of a crime is under the "supervision and control" of the Prosecutorial Agency. The Prosecutorial Agency "is empowered to undertake the preparatory investigation tasks . . . and to order the application of

---

[3]There are two editions of the World Factbook of Criminal Justice Systems: Costa Rica available through the DOJ website. One authored by Henry Q. Giralt and a second, updated and more detailed analysis authored by Jose Maria Rico. Both reports are referenced in this Opinion.

precautionary measures (especially preventive imprisonment of the accused)."

Members of the regular police force are regarded as officers of the Judicial Police, also known as the OIJ, when "performing duties provided for in the Penal Procedural Code . . . [and] are under the authority of the judges and prosecutors." Upon arrest, an accused is taken before a fact-finding authority. "If the case is felt to have sufficient merit in the opinion of the investigator[,] it is processed to the next level, where a judge of instruction hears the facts of the case." The job of the judge of instruction "is to gather further evidence if necessary and ensure that the case is ready to be tried." That judge may also determine the crimes for which the defendant may be charged.

The warrant for Nolan's arrest was issued by a judge, as required under Article 9(4)(a) of the Treaty. Judge Elizondo's signature appears on the original Spanish version. Moreover, in addition to the warrant, the extradition packet includes an extradition request dated March 20, 2009, completed by Judge Moreno. (B. 90-101). In the extradition request, Judge Moreno notes that "criminal case number 06-006285-647-TP has been filed [against Nolan], wherein a warrant for his arrest was issued . . . and by reason that it has been accredited that the need exists to accuse him regarding the events investigated against him." (B. 80). This further demonstrates that the evidence is sufficient to charge Nolan under Costa Rican law, and bolsters the government's contention that the warrant is equivalent to a charging document. Accordingly, Nolan's request to deny extradition due to the absence of a charging document is denied.

### 2. Failure to Authenticate

Nolan argues that the supplemental submission offered by Costa Rica does not

comply with the extradition statute and should therefore be excluded. This Court previously denied Nolan's motion to exclude the government's supplementation of the request for extradition. [27]. Nolan did not file a motion to reconsider, and we see no reason to revisit that holding. Nevertheless, in an abundance of caution, we will consider the merits of Nolan's argument.

Pursuant to the extradition statute, proffered materials "shall be received and admitted as evidence . . . if they shall be properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped." 18 U.S.C. §3190. The statute further provides that "the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country shall be proof that the same, so offered, are authenticated." 18 U.S.C. §3190. Unlike the initial extradition packet, the government's supplemental submission does not contain a certificate. However, this omission is not dispositive. *See e.g. Bovio*, 989 F.2d at 260 ("While certification is conclusive proof that documents are admissible . . . [s]ection 3190 does not purport to be the only means by which a document is admissible in an extradition proceeding.").

The supplemental submission is a request to "the pertinent authorities in the United States" through the "Supreme Court of Justice Secretariat" from the "Public Prosecutor of the Prosecution Office Against Organize Crime," of which the United States Embassy in Costa Rica and the Costa Rican Consulate in Washington, D.C. "are being made aware." (SE. 1). It begins with a sworn statement from Prosecutor Rojas seeking, in his position as Public Prosecutor, to present "additional evidence that sustains the extradition order in regards to the accused Matthew Francis Nolan, also

16

known as Matthew MC Call, in process against him for the crimes of falsification of documents, Aggravated Kidnapping and Aggravated Homicide, case number 06-006285-647-TP." We interpret this to mean that the evidence included in the supplemental submission has been submitted in case number 06-006285-647-TP, and is therefore entitled to "be received for similar purposes by the tribunals of [Costa Rica]." Accordingly, Prosecutor Rojas' statement sufficiently authenticates the supplemental submission. *See Shapiro v. Ferrandina*, 478 F.2d 894, 903 (2nd Cir. 1973), cert dismissed 414 U.S. 884, 94 S.Ct. 204 (1973), (rejecting defendant's efforts to exclude documents not mentioned in certificate identifying materials submitted in support of an extradition request as "savoring of technicality" which "is particularly inappropriate in dealings with a foreign nation.") (quotation omitted).

### 3. Impermissible Summary Statements

The evidence submitted in support of the request for extradition includes summaries of interviews with relevant witnesses conducted by the Costa Rican authorities. Nolan argues that these summaries are unreliable double hearsay and should not be considered by this Court. In support, Nolan cites *In re Mazur*, 2007 U.S. Dist. LEXIS 52551 (N.D. Ill. Mar. 15, 2007) and *In re Extradition of Platko*, 213 F. Supp. 2d 1229 (S.D. Cal. July 26, 2002). Nolan relies on the *Mazur* court's recognition of "a couple of troubling aspects" of certain statements submitted in support of an extradition request, including that the court received "abstracts of the statements, not the statements themselves." *Mazur,* 2007 U.S. Dist. LEXIS 52551 at *62-63. Despite this observation, the *Mazur* court went on to consider the substance of those abstracts and

found that, when read together, fourteen statements from the government's star witness taken over a period of about four years "contain so many inconsistencies that it is difficult to imagine that the government thought they could give rise to probable cause." *Id.* at *64. The court further noted that in several statements the star witness "either admits that he lied under oath, admits that he essentially made up the connection between [the defendant and the victim] or he admits that he is providing information in exchange for a reduced sentence in the murder case for which he was being detained." *Id.* at * 67. As this analysis demonstrates, the *Mazur* court actually considered the abstracts, and did not refuse to consider them on procedural grounds. *Id.* Similarly, the *Platko* court declined to consider "summaries of statements that were purportedly made by accomplices, and several witnesses and victims" because those statements had not been authenticated. *Platko*, 213 F. Supp. 2d at 1238 (noting that "[t]he papers presented in support of Platko's extradition contain no affidavit, declaration or other form of sworn statement by any person with knowledge of the underlying facts to support the Czech Republic['s] charging papers, or even certifying the representations contained therein were actually made as recorded there."). These facts are not present here.

This Court may properly consider "evidence in its probable cause determination, whether sworn or unsworn, or whether the evidence consists of an actual statement given by a witness or a summary thereof." *In re Sainez*, 2008 U.S. Dist. LEXIS 9573 at *46-47 (citing *Artukovic v. Rison*, 784 F.2d 1354, 1356 (9th Cir. 1986); *Zanazanian v. United States*, 729 F.2d 624, 627 (9th Cir. 1984)); *see also Collins*, 259 U.S. at 317, 42

S.Ct. at 472. (1922) (noting that "unsworn statements of absent witnesses may be acted upon by the committing magistrate, although they could not have been received by him under the law of the State on a preliminary examination."). Accordingly, Nolan's request to exclude the interview summaries from our probable cause determination is denied. *See id.; In re Okeke,* 1996 U.S. Dist. LEXIS 22379 at *3 n. 1 (relying on summary reports of witness statements).

### 4.    Consciousness of Guilt Evidence

In its post-hearing brief, the government asks this Court to consider evidence related to Nolan's consciousness of guilt. The government states that on March 11, 2009, MCC officials found evidence that Nolan was planning an escape during a search of his cell in the Special Housing Unit. Although the government "has yet" to formally charge Nolan with violating 18 U.S.C. § 751, it asks this Court to find "Nolan's attempted escape is evidence of his consciousness of guilt [for] Robert Cohen's murder."

Evidence of escape or attempted escape may be admissible to show consciousness of guilt, as well as guilt itself. *See e.g. United States v. Skoczen,* 405 F.3d 537, 548 (7th Cir. 2005). This type of evidence may be considered in the context of an extradition. *See In re Garcia,* 188 F. Supp. 2d at 935 (considering evidence that defendant fled Mexico immediately after the night of the assault which formed the basis of the extradition request). However, the extradition statute requires that documents admitted into evidence be "properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the

accused party shall have escaped." 18 U.S.C. §3190. While evidence of escape is admissible under United States law, there is no basis upon which this Court can find that evidence of this nature could be considered by the Costa Rican courts. Accordingly, we have not considered the proffered consciousness of guilt evidence in connection with our probable cause determination.

## V. SUMMARY OF COMPETENT EVIDENCE OFFERED IN SUPPORT OF HOMICIDE AND KIDNAPPING CHARGES[4]

Nolan is accused of Cohen's homicide. Prior to 2004, Cohen worked as an accountant for a Florida businessman named Robert Breska ("Breska"). (B. 12). Cohen developed and managed various investments for Breska, and acted as a real estate investor and developer in Costa Rica and Nicaragua. In 2004, Cohen lost approximately $7 million of Breska's money. (*Id.*). The Costa Rican authorities surmise that Cohen's business partner Mario Quintana Musmanni ("Quintana") misappropriated Breska's funds and blamed Cohen for the loss of the investment. Quintana committed suicide on October 13, 2004. (B. 2). Costa Rica contends that Breska hired Nolan to kidnap and torture Cohen in an effort to recover the $7 million.

The supplemental record includes a number of emails that substantiate the relationship between Breska, Cohen and Quintana, as well as Cohen's inability to provide funds owed to Breska upon demand. (SS. 55 - 63). Costa Rica also relies on Cohen's October 27, 2004 letter to his attorney, Tonya Plaut, as evidence of Cohen's relationship with Breska. (SS. 52-53). In that letter, Cohen states that "Breska asked

---

[4]Unless otherwise stated, these findings are based upon the evidence, including summaries of witness statements and investigation reports, submitted to this Court and presented during the extradition hearing by the Assistant United States Attorney.

[him to] put him in contact with a person capable of handling offshore transactions. I introduced him to Mario Quintana . . . [who] set up three corporations for Mr. Breska; Primagem SA, Eucla Nosh SA, and Los Zambos." (Id.). Cohen also states that Breska's funds were stolen by Quintana, who later committed suicide, and that Breska made statements that Cohen "took as a threat." (SS. 53.). Finally, Cohen stated his belief that Breska "is capable of putting my life in danger . . . If anything were to happen to me, Mr. Breska would be the person responsible." (Id.).

Costa Rica contends that Breska introduced Cohen to Nolan, then known as Matthew McCall Oppenheimer,[5] and instructed Nolan to recover the missing funds. (B. 12-13). There is competent evidence that Nolan used the aliases "Matthew McCall-Oppenheimer and "Matthew McCall." According to the investigation summary prepared by the Costa Rican Prosecutor's Office, "[i]n order to hide Nolan's real occupation as a hired killer, Breska told Cohen this man was a multimillionaire and a member of a family that was dedicated to the jewelry business and who was interested in doing business in Costa Rica, Breska thereby convincing Cohen to meet with Nolan in San Jose, Costa Rica." (B. 2-3). This theory is supported, in part, by an email from Cohen's daughter, Alisha, which states that Breska introduced Cohen and Nolan. (B. 65). There is also evidence that Nolan, Cohen and Breska met in the United States in February 2005. (SS. 67, 77, 84). The supplemental record includes an email from "MM McCall-Oppenheimer" at "mcall-opp@web.de" to Cohen confirming a meeting in Orlando on

---

[5]Nolan/McCall is alternatively identified as "McCall," "Mc Call," "Mac Call," and "Mc Callan" by various Costa Rican authorities. We assume that these are all alternate spellings and/or translations of the same name.

Friday, February 18, 2005. (SS. 67). On or around February 16, 2008, Cohen placed

Nolan in contact with his lawyer Manrique Lara Bolanos ("Bolanos"), whose office is in

San Jose, "behind the Multiplaza Shopping Center which is across from the

Intercontinental Hotel." (SS. 64, 67).

In February 2005, Nolan stayed at the Aurola Holiday Inn Hotel in San Jose,

Costa Rica. (B. 3). Luis Alonso Douglas Mejia ("Mejia"), who was later convicted of

Cohen's kidnapping and murder, worked as a bellboy at the hotel. (B. 15). In the initial

submission, Costa Rica contends that "Mejia contacted the accused and for a still

undetermined amount of money, hired his services, both of them planning the manner

in which they would deprive the victim of his freedom, in order to later murder him." (B.

3). Costa Rica did not submit evidence corroborating its assertion that Mejia hired

Nolan - or Nolan hired Mejia - for the express purpose of murdering Cohen.

On February 6, 2005, Nolan rented, under his own name, a white Toyota

4Runner, license plate number 447022 (the "4Runner") from ANC Car Rental, S.A.

("ANC"). (B. 79). Nolan does not dispute that he is the individual who rented the

4Runner. Following the discovery of Cohen's body, the Costa Rican police interviewed

an ANC employee named Luis Felipe Tejada Alvarez ("Alvarez"). ( *Id.*). According to

Alvarez, Nolan presented U.S. passport number 702057184, a passport number that

also appears on the rental car agreement. ( *Id.*). Although the Costa Rican authorities

contend that Nolan authorized Mejia as a driver in the contract, Mejia's name does not

appear on the rental car agreement attached as an exhibit to Nolan's response to the

government's memorandum in support of extradition. Nevertheless, there is evidence

of a connection between Mejia and the 4Runner. An investigation conducted by the

Costa Rican authorities revealed that the registration book of the Holiday Inn parking lot contains a number of entries for the 4Runner "driven by Nolan Matthew and Luis Alonso Douglas, who worked in that hotel . . . and was later fired for having transported some guests to Juan Santamaria Airport in the Toyota Four Runner used by Nolan." (B. 15-16). The authorities also determined, through a statement from the hotel parking lot guard Jesus Castro Chinchilla, that it was "normal" to see Mejia "come in driving the vehicle, license plate number 447022, since [Mejia and Nolan] had become very good friends." (B. 78).

Alvarez informed the police that, according to the contract, Nolan was to return the 4Runner on February 13, 2005, but failed to do so. (B. 79). An individual affiliated with the rental car company filed a missing vehicle report on March 4, 2005. Following Cohen's death, on March 14, 2005, the Costa Rican police recovered the 4Runner in the area of Guarari, Heredia. (B. 79). "Apparently, the vehicle was in [the] hands of a person called Luis Alonso Douglas Mejia." (Id.). Mejia reported that the 4Runner had been rented by a "gringo called Nolan Matthew, who he had met at the Aurola Holiday Inn Hotel." (B. 80). The police report also indicates that, following the return of the 4Runner, ANC employees found "two Motorola cell phone batteries, a cell phone charger, and a roll of grey adhesive tape" inside the vehicle. (Id.). The police later determined that Mejia received two tickets while driving the 4Runner, one on February 25, 2005 and a second on March 5, 2005. (B.81).

There is competent evidence that Nolan and Cohen planned a trip to Costa Rica and Nicaragua from March 2, 2005 through March 8, 2005, and that Nolan was with Cohen on March 6, 2005. (SS. 64-72). The supplemental record includes an email

23

from Nolan (again as "McCall-Oppenheimer MM") at "mccall-opp@web.de" dated February 22, 2005 regarding the "trip to cr." (SS. 70-71). In that email, Nolan requests that Cohen book "the leg down south" as "Mon. Matthew F. McCall-Oppenheimer (UK passport) 252 bis rue de Ponthieu Paris 75008." (*Id.*). According to the FBI report included in the DOJ Response, "[i]nvestigation by the French Nacional Police also determined that 252 bis Rue de Ponthieu, Paris, France is a false address." (SS. 76). Nolan's email lists a contact number of "07913-423370 (Cell.UK)." (SS. 70). The FBI confirmed, through New Scotland Yard, that "44-791-342-3370" is a cellular telephone in Great Britain, subscribed to a resident in London later identified as Nolan's father. (SS. 78).

Nolan checked into the Real Intercontinental Hotel in Escazu, San Jose (the "Intercontinental") on March 2, 2005. (B. 3). Based on subsequent statements of various hotel employees, it appears that he registered as Matthew McCall. (B. 54). Cohen also had a room at the Intercontinental. According to the Costa Rican police, Cohen stayed in room 549 and Nolan stayed in room 548. (*Id.*). Nolan and Cohen were scheduled to check out on March 6, 2005 and travel to Nicaragua. (*Id.*). According to a police report, a Copa Airlines employee confirmed that "a reservation was made in the name of Robert Cohen, for 06 March, flight 116, San Jose-Managua destination, Business Class, but they [presumably Nolan and Cohen] did not appear and did not cancel the reservation, so they did not travel." (B. 77).

The Costa Rican authorities contend that during his stay at the Intercontinental, Nolan "learned that [Cohen] used to walk in the morning in the parking areas of the Multiplaza Shopping Center, located across the street from the Hotel." (B. 4). They

further allege that after Nolan discovered Cohen's morning ritual, he "agreed with convicted co-author [Mejia] that on the morning of the sixth of March they would execute the plan to kidnap the victim." (B. 4). Aside from this allegation, there is no evidence of a premeditated plan to kidnap Cohen. There is evidence that Nolan and Cohen spent time together on March 4 and 5, the days immediately preceding Cohen's disappearance. Nolan and Cohen had lunch with Bolanos, Cohen's attorney, on March 4, 2005. (B. 56-57). Bolanos stated that he and his wife attended an Andrew Bochelli concert with Cohen and Nolan on the evening of March 5, 2005. (B. 57).

Costa Rica did not submit a transcript of the testimony introduced at Mejia's trial, or a statement from Mejia averring that he and Nolan conspired to kidnap Nolan. Nevertheless, we recognize that Mejia has been convicted of "not for profit kidnapping on substantive grounds in prejudice of Robert Curtis Cohen." (B. 88-89). Therefore, we assume that Mejia did, in fact, kidnap Cohen. In the extradition request, Costa Rica contends that Nolan and Mejia accomplished the kidnapping by forcing Cohen into Nolan's 4Runner. "On the sixth of March at approximately six in the morning, the accomplice Douglas Mejia arrived in the Toyota Four Runner vehicle license plate 44702 [at] the parking area of the Multiplaza Shopping center where, precisely, the victim was taking his morning walk in the company of the accused Matthew Francis Nolan, where they both proceeded to violently introduce the victim in[to] the vehicle, depriving him of his freedom, and proceeded to leave the site." (B. 4).

A video from the Intercontinental shows Cohen and Nolan having breakfast at approximately 6:45 a.m. on March 6, 2005. (B. 14). The Costa Rican police interviewed Luis Mariano Leon Umana ("Umana"), the head of security at the

Intercontinental. (B. 54). According to the summary of that interview, Umana stated that at 6:40 a.m. on March 6, 2005 Cohen went on his morning walk "in the company of a partner named McCallan." (Id.). Umana described Cohen as "wearing a white t-shirt, black shorts, black tennis shoes, white socks" and Nolan as "wearing jeans and [a] white shirt." (Id.). Leonel Jimenez Alpizar ("Alpizar"), a receptionist at the hotel, also saw Cohen leave with "McCallan" on the day of his disappearance. (B. 55).

The Costa Rican authorities report that a second video, taken in the hotel parking lot several minutes later, shows Cohen and Nolan approaching a white Toyota 4Runner. (B. 14). Neither Cohen, Nolan, nor the 4Runner are in the next shot. Costa Rica contends that the vehicle is the 4Runner rented by Nolan and driven by Mejia. (Id.). Other evidence, in particular the summary of an interview with Dennis Arteta Pinell ("Pinell"), the head of security for the Multiplaza Shopping Center, suggests that the video is from the Multiplaza. According to Pinell, security cameras show a white Toyota-brand 4Runner entering the parking lot at approximately 6:25 a.m. on March 6, 2005. (B. 55-56). The video then "shows Cohen and Mc Callan as they walk into the parking lot, and after some time, it can be seen that the vehicle moves and parks in another spot of the same parking lot, then it shows Cohen and Mc Callan walking in the direction of the vehicle, it shows when both stop for a moment next to the vehicle and then it shows it leaving the parking lot and the gentlemen are no longer seen." (B. 56). The license plate of the vehicle cannot be seen in the video. There is evidence that the Multiplaza is adjacent to the hotel parking lot.[6] (SS. 67). Accordingly, it is reasonable

[6]This Court's review of the Intercontinental's website further confirms the proximity of the hotel and the Mutliplaza. See

to infer that both the investigation summary prepared by the Costa Rican prosecutor and Pinell's statements are in reference to the same video.

Cohen's disappearance on March 6, 2005 is further corroborated by the DOJ Response. According to the FBI, the American Embassy in San Jose, Costa Rica received a message from the American Embassy in Managua, Nicaragua on March 6, 2005, requesting that a missing person investigation be initiated regarding Cohen, "who had been scheduled to travel to Nicaragua from Costa Rica on a business trip and never arrived." (SS. 74).

The government contends that after kidnapping Cohen, Nolan and Mejia separated, but stayed in phone contact with each other. Costa Rica posits that Nolan returned to the Intercontinental around 10:00 a.m. on March 6, 2005, retrieved certain documents from Cohen's room, and then fled the country. (B. 4). There is credible evidence that Nolan returned to the Intercontinental without Cohen and reported that his wife was ill.[7] Bolanos informed the Costa Rican police that he received a call from Ricardo Quesada Brenes ("Brenes") "saying something strange may be happening because mister Cohen had disappeared . . . he met with Mc Callan and he told him that his wife was sick in France (she's pregnant) and that he helped Mc Callan find a ticket so he could travel." (B. 56-57). This is consistent with Brenes' report that he saw Nolan

---

www.ichotelsgroup.com/intercontinental/en/gb/locations/costarica-sanjose

[7]Nolan asks this Court to consider various records from Erika Nolan's doctor, including a note stating "March 6th - Taken to Northwestern Emergency room [in Chicago] to seek medical attention for erratic chest pains and migraines. Emergency call to husband who was overseas to come home immediately. Sent home for bed rest." The government persuasively argues that the medical records should not be considered to the extent they are offered to contradict Nolan's travel records. *Eain*, 641 F.2d at 511.

at the Intercontinental on March 6, 2005. (B. 14). At that time, Nolan "told [Brenes] he did not know where Cohen was and asked [Brenes] to help him leave the country immediately. . . . [Nolan] had to leave Costa Rica urgently because his pregnant wife was in Paris and had gotten sick." (Id.). There is evidence that Brenes helped Nolan obtain an emergency airline ticket through Continental. (SS. 74). Brenes' relationship to Nolan, Bolanos and the Cohen family cannot be determined based on the record currently before this Court.

The Costa Rican authorities interviewed Umana, the head of hotel security, who stated that "after Cohen's disappearance, his friend McCallan arrived at the hotel by foot at 10:00 hrs saying his wife was hospitalized and that he had to leave the country immediately." (B. 54). The extradition packet also includes a summary of a statement given by a receptionist on the fifth floor of the hotel who recalled that McCall returned to the hotel without Cohen and reported that he had to leave because his wife was hospitalized. (B. 55). The extradition packet does not include a witness statement or other form of evidence corroborating Costa Rica's assertion that Nolan "retrieved certain documents" from Cohen's room.

Costa Rica's submission also includes evidence that Brenes, rather than Nolan, removed documents from Cohen's room on the morning of March 6, 2005. Luis Mariano Leon ("Leon"), a hotel employee, reported that Brenes received a copy of Cohen's room key on the morning of March 6, 2005. (B. 69). Apparently, Brenes gained a room key by taking advantage of a new employee, and gained access to the room. (Id.). This is consistent with a statement obtained from Olman Chavarria Gonzalez ("Gonzalez"), a maintenance manager at the hotel, who reported that "some

28

men who said they were friends of mister Cohen, mister Ricardo Quesada and Francisco Miranda" - but not Nolan - entered Cohen's hotel room on March 6, 2005. (B. 55). According to Gonzalez, after opening Cohen's room they "noticed all of his belongings were there, including watches, a credit card, two cellular phones etc. and under the door there is a note written by Mc Callan where he says he has got to go and that they would speak later." (*Id.*). Gonzalez also stated that Brenes "took some documents that were in the room indicating he needed them and that they were important." (*Id.*). The Costa Rican police interviewed Alisha Cohen, Cohen's daughter, who reported that Brenes "called her and told her . . . that at 09:00 hours he arrived at the hotel . . . asked that Cohen's room be opened, that he had not packed and that he had taken some documents and that on Monday 07 March he gave the documents to [Bolanos]." (B. 60).

There is evidence that Brenes planned to accompany Nolan and Cohen to Nicaragua. The Costa Rican prosecutor summarized Bolanos' report of Cohen's disappearance as follows:

> Mister Lara Bolanos Manrique claims that on 06 March 2005, around 06:40 hrs., mister Robert Curtis Cohen, 63 years old, left the Real Intercontinental Hotel to exercise and never returned since that time. In his room he left all of his personal effects, with the exception of his passport and wallet. He said he was going to Nicaragua 06 March, in the company of a friend named Quesada [a/k/a Brenes], who is present at the time the claim is filed and when asked about Robert claims not to have seen him and that he doesn't know anything about him.

(B. 53). Bolanos also indicated that Cohen would not leave "without his watch, his cellular phone and without his glasses and that they all are in his hotel room." (B. 54). That report further states that Bolanos "was also told at the hotel that Cohen had called

06 March in the afternoon asking that the stay in his room be extended for three more days, however this behavior is not usual for him." (B. 54).

Flight records indicate that Nolan left Costa Rica on March 6, 2005 on a Continental flight to Houston. (SS. 84). According to the FBI, Costa Rican Immigration officials found a departure card under Matthew Francis Nolan, American passport 207449439, with 252 Rue de Ponthieu, Paris, France as the traveler's residence. (SS. 76). This is the same address mentioned in Nolan's February 22, 2005 email and confirmed by the French Nacional Police as a false address. (SS. 70, 76). The Costa Rican authorities contend that Nolan also flew to Paris and New York, and then returned to Miami. This is consistent with the results of the FBI investigation. According to the DOJ Response, Nolan "departed San Jose, Costa Rica on 03/06/2005 arriving at 7:04 p.m. to Houston International on Continental Airlines flight 1103. From Houston, Nolan flew to Paris France." (SS. 77). The FBI also found that Nolan "departed Charles de Gaulle, Paris, France, on 03/08/2005 to John F. Kennedy, New York, NY on American Airlines flight 121." (Id.). The investigative summary prepared by the Costa Rican Prosecutors' Office states "a photocopy was seized of the Departure and Arrival Card from Migration Records in [Nolan's] own name, that corroborates Nolan's route, who traveled to Paris, Paris - New York and New York - Miami." (B. 14-15). That record is not included in Costa Rica's submission.

In the initial submission, Prosecutor Rojas concludes that on March 9, 2005 Mejia "gave his cellular telephone number 380-9763" to Cohen "in order to maintain the false expectations . . . that he would be kept alive and would soon be returned to San Jose." (B. 5). He further contends that Cohen used the 380 phone to "communicate

30

with his daughter Alisha Cohen in the United States, wherein he made it known to her using coded language that he was being held captive in an area of Limon." (*Id.*). Other evidence before this Court demonstrates that Cohen first called Alisha sometime prior to 6:00 p.m. on March 6, 2005 - and not on March 9, 2005 as initially alleged. (B. 58). The Costa Rican police determined, with the assistance of the United States Embassy in Costa Rica, that Cohen called his daughter, Alisha, at least twice from the 380 phone. They also determined that Alisha and/or her mother called the 380 phone and spoke with Cohen on at least five occasions. (B. 58-61). Alisha reported that on March 6, 2005 her father gave her "a number where they could call him, that everything is fine and that he loved them very much." (B. 58). Cohen's wife called him at 6:00 p.m. that evening and was told "not to worry." (B. 58-59). Alisha called her father at "11:00 hours" on March 7 and informed him that "many people are looking for him." According to the report, Cohen responded "Alisha this is not a movie, it is real, you cannot give this number to anyone or I'm dead." (B. 59). Alisha called "again" at "10:30 hours" and, after an initial discussion with "a man [who] answers in Spanish," asked her father if he had been kidnaped. In response, Cohen "told her you are intelligent and I love you very much." (*Id.*). Cohen also stated that he "was coming home . . . but did not know when." Alisha called the cellphone at "17:00 hours" on March 7, 2005 and was told by Cohen that "this man wants me to tell you it's Breska, I love you." (B. 60). Finally, the police report indicates that Cohen called Alisha at "13:30 hours" on March 8, 2005, reported that he was "safe" and in the "same place as yesterday," and that there were affairs that had to be settled. (B. 61). When asked if he was being treated well, Cohen "answered yes and that he was putting Alonso on the phone, it was the same voice that answered

in Spanish. . . . and he tells her I am protecting Bob from the people who want to hurt him." According to the report, "Alisha asked [Cohen] if he was the same person 'Breska' and he said yes." (Id.).

Although Costa Rica's submission does not include specific evidence of Nolan's actions on March 7 and 8, 2005, there is evidence suggesting that Brenes and Bolanos were attempting to locate Cohen. Leon, the hotel employee, reported that Brenes and Francisco Miranda Delgado ("Delgado"), a taxi driver who worked for Cohen, returned to the hotel on March 7, 2005, "asked for Cohen at the reception, where they were told he was not there," then proceeded to have lunch at the hotel, "indicating to the person waiting on them that the bill . . . should be charged to mister Cohen's room," and Brenes "proceeded to imitate the signature of the victim on the bill." (B. 69). At "13:00 hours" on March 7, 2005 Brenes called Alisha Cohen and reported "what had happened on 06 March." Later that day, at "19:45 hours," Bolanos, Cohen's attorney, called Alisha and "tells her what is being done in Costa Rica." (B. 60). Bolanos called again on March 8, 2005 and told Alisha that "Ricardo [Brenes] was going to Nicaragua to get some money for any expenses. He told her he did not trust Ricardo." (B. 61). Brenes called Alisha a few hours later, at "21:15 hours" on March 8, 2009, and reported that he "was trying to protect from all angles in Nicaragua and Costa Rica." Brenes also stated "I am protecting your father's life and then his business." (Id.).

Flight records show that Nolan left Miami and returned to Costa Rica on March 9, 2005 aboard flight AA937. (B. 78). According to Prosecutor Rojas, Nolan "returns to Costa Rican soil and travels to the Atlantic zone to the site of captivity." (B. 5). Once there, Nolan along with Mejia, "continued to torture the victim, thereby increasing the

32

injuries to internal organs . . . which caused a massive hemorrhage and resulted in death" on March 10, 2005. (*Id.*). The government relies on the phone records to show that "within hours after Nolan returned to Costa Rica, Nolan traveled to the Province of Limon, where Cohen's body was found" and, along with Mejia, "continue[d] to torture the victim . . . which caused a massive hemorrhage and resulted in death." (SE. 3-4, 27-33, B. 5).

The extradition request contains a second, and potentially inconsistent, account of Nolan's whereabouts following his return to Costa Rica on March 9, 2005. The extradition request states that "[o]n the ninth of March two thousand five, Nolan returned to San Jose from Miami and stayed at the Aurola Holiday Inn Hotel under a false name." (B. 15). The extradition packet does not include a witness statement, copy of the hotel guest registry, or any other piece of evidence that corroborates this assertion. It does include a police report stating that Nolan "had been lodging at the Aurola Holiday Inn Hotel in San Jose under the name of Nolan Matthew Francis, occupying rooms 1516, 1508 and 1510 between February 06 and March 11, 2005." (B. 78). This same report also indicates that Nolan departed Costa Rica on March 11, 2005. (*Id.*).

On March 10, 2005, the body of a Caucasian male between 60 and 65 years of age was discovered in the Matina de Limon region of Costa Rica, under a bridge that crosses the Chirripo River. (B. 75). Costa Rica contends, in the international arrest warrant, that it was determined "through the preliminary autopsy report, that the victim died a few hours before he was found and with evident signs of punishment and torture." (B. 39). The preliminary autopsy report is not before this Court. However, a

33

police report indicates that Coroner Jose Luis Duran Ramirez conducted a preliminary examination of the lesions on the body and indicated that the manner of death was homicide. (B. 75). Examination of the clothing revealed, among other things, a card from the "Real Intercontinental," causing the Costa Rican police to "suspect that said person could be lodged at that hotel." (*Id.*). Subsequently, Costa Rican authorities determined that the body was that of Cohen.

There is little doubt that Cohen's death was caused by trauma. Forensic pathologist Luis Solorzano Sandoval ("Dr. Sandoval") performed the autopsy of Cohen's body. (B. 67). According to the police report, that autopsy revealed hemorrhages in the neck muscles, a fracture of the thyroid cartilage, lesions, and various injuries that could have been caused by a blunt object. (*Id.*). Dr. Sandoval testified at Mejia's trial. (B. 16-17). His trial testimony has not been submitted to this Court. According to the prosecutor's summary, Dr. Sandoval submitted a report, testified to "the medical reasons to consider that Cohen was tortured," and declared that "[t]here are other injuries that may or may not be related with the cause of death . . . which indicate that the person suffered pain, anguish in the situation." (B. 16). A forty-two page photographic sequence admitted at Mejia's trial apparently shows "the multiplicity of injuries" to Cohen's body, "as well as the photographs associated with forensic autopsy number 05-539 . . . wherein the coroner assess the cruel treatment to which Cohen was subjected during his captivity." (B. 16-17). The photographic evidence and autopsy report are not before this Court, and we cannot determine if the individual who completed the summary has personal knowledge of its contents. Costa Rica also submitted a "Legal Medical Opinion" from the "Department of Legal Medicine

34

Section of Forensic Pathology." (B. 71-74). That report identifies the cause of death as "[m]echanical traumatism on back, buttocks and posterior face of thighs with massive sub-cutaneous (illegible)," and lists the lesions found on Cohen's body. (B. 71). It does not provide any information regarding time of death.

The evidence demonstrates that Nolan left Costa Rica for Los Angeles on March 10, 2005 aboard flight AA938. (B. 78). There is no indication that Nolan had any further contact with Mejia. However, there is competent evidence that Nolan continued his efforts to locate Breska's assets following Cohen's death. Nolan was detained at the Atlanta Georgia airport in January 2006. (SS. 79). The supplemental record includes an email, found on Nolan's person during that detention, addressed to "Matt Francis <spikeassetrecovery@yahoo.ie>" and dated November 10, 2005. That email describes various efforts to locate assets linked to "Robert Cohen" and "Primagem" in Thailand. (SS. 54). Primagem SA is one of the three corporations Quintana set up for Breska. (SS. 52).

## VI. ADDITIONAL EVIDENCE OFFERED IN SUPPORT OF THE HOMICIDE AND KIDNAPPING CHARGES

Costa Rica's submission also includes an analysis of the phone records for cellular numbers 378-1326 and 380-9763, numbers that Costa Rica associates with Nolan and Mejia, from March 5, 2005 through March 10, 2005. (SE. 6-42). The government relies on the analysis as evidence of Nolan's role in Cohen's murder and kidnapping. Nolan argues that the analysis is speculative and conclusory, and fails to set forth facts from which the reliability of the source and probable cause can be inferred. Nolan also challenges Costa Rica's reliance on narrative statements. Nolan

contends that these narratives are legally inadequate in that they do no indicate which allegations are based on the prosecutors' personal knowledge and which are based on conjecture, and frequently do not indicate the source of the factual allegations.

## A. The Phone Records

Oscar Wong Carrion, a criminal analyst ("Analyst Carrion"), prepared the phone record analysis, which was subsequently approved by Prosecutor Rojas. (SE. 6). The analysis presumes that Mejia was the holder of mobile line 380-9763 (the "380" phone), Mejia gave mobile line 378-1326 (the "378" phone) to Nolan, and Nolan had continued possession of the 378 phone from March 5 through 10, 2005. (SE. 1). It includes a chart of the outgoing and incoming calls for the 378 and 380 numbers that identifies the following: (1) register or record number (identified herein by "R."); (2) "System" (generally Erickson or Lucent); (3) "Origin" which, according to the government, is the phone number associated with the outgoing call; (4) "Destination" or number for the phone that receives the call; (5) "Day (d.m.y.)"; (6) "Time"; (7) "Duration"; (8) "OutRoute"; (9) "Cell" or location of the outgoing phone; (10) "InRoute"; and (11) "Cell" or location of the phone receiving the call. (SE. 8). The analyst also includes a narrative summary of each relevant call, identified by the record number.

Nolan challenges Costa Rica's efforts to place the 378 phone in his possession. According to the Costa Rican prosecutor, "Mejia . . . was the person who gave Francis Matthew Nolan, a cell phone with phone number: 378-1326, which was bought by [Mejia] to the witness Alex de Jesus Cervantes Chaves, in the amount of sixty thousand colones, as taken from the declaration of the witness in the trial that was done; also [Mejia] was the holder of mobile line 380-9763, which was registered to a person by the

36

name of Rosalinda Alvarez Murray." (SE. 1). We have no reason to doubt the prosecutor's summary of the testimony introduced at Mejia's trial. Moreover, there is additional evidence that corroborates his statement, namely the fact that the 378 number appears on the bank application. Accordingly, it is reasonable to infer that Nolan had possession of the phone on March 4, 2005 - immediately prior to the time frame covered by the analysis.

Although our determination hinges on the evidence offered against Nolan, this Court must also consider evidence that connects Mejia with the 380 number. In oral arguments before this Court, the government relies on a series of calls from the 380 phone to Mejia's home residence, a 261-5114 land line, to support the connection. The government also cites a number of calls made by Cohen to his daughter on the 380 phone. A police report included in the extradition packet states that, during his captivity, "Cohen gave his daughter a telephone number to call him, but she was not to give it to anyone or he would be killed." (B. 58). That report further states that, "[t]hrough the Embassy of the United States in Costa Rica, information is obtained that Cohen has been calling his daughter since Sunday 06 March 2005 and gave her a telephone number so she could communicate with him, this number is 381-9763." (*Id.*). Because this number is almost identical to the 380 number (the only difference being 381 - 9763, as opposed to 380 - 9763), we presume that this is a typographical or translation error. An investigation summary prepared by the Costa Rican prosecutors also states that the number Cohen used to call Alisha Cohen, his daughter, is "the telephone line . . . for a cellular phone property of [Mejia's] wife." (B. 15). Taken together, this evidence sufficiently convinces us that Mejia had possession of the 380 phone during the

relevant time period.

Next, this Court must determine if the phone record analysis is competent evidence of Nolan's location during the events in question. We find it is not.

Analyst Carrion includes several qualifiers that render the records unreliable. For instance, Analyst Carrion notes, without explanation, that "all data [used in the analysis] was stored and revised." (SE. 7). We cannot determine how the data was "revised," and the degree to which that influenced or changed the analyst's conclusions. Even more troubling is Analyst Carrion's concession that the analysis is based on a "possible," rather than definitive, geographic location for the phone.

> As an important fact, we must observe that radio bases establish a 'possible' geographic location of a cellular phone at the time a[] phone call is generated or received, because such information indicates that certain radio bases or cells, were used by the cellular phone studies as an interaction with the telephone centra, to receive or make calls; it does not establish an exact location where the cellular phone was located in regards to those radio bases, it only indicates that one or another radio base was used, which means that the phone could be located in a near area to the base in most cases (although exceptions can be made), it could be meters or kilometers, but indeed within the coverage range.

(SE. 8). This evidentiary value of the "possible" geographic location is further undermined by the margin of error for the coverage area. As Analyst Carrion explained, San Jose is "defined by the large amount of radio bases present, thus coverage could be from meters to kilometers (approximately 3 kilometers), hence, information of an exact location would only be established eventually by the technicians in ICE's[8] cellular centrals." (SE. 7). Based on the qualifiers included in the analysis, we cannot rely on the phone records as evidence of Nolan's geographic location.

--------------------------------------

[8]ICE (Costa Rican Institute of Electricity) is the state-run telecommunications service.

The conflicts and inconsistencies within the phone records further convince us that they have no evidentiary value. As Nolan's counsel illustrated in oral arguments before this Court, the geographic locations of the calls cannot always be reconciled. For instance, the records show multiple entries for the same time in conflicting locations at 5:39 a.m., 5:47 a.m., 6:27 a.m., and 6:30 a.m. on March 6, 2005. (SE. 12). Analyst Carrion acknowledges these inconsistencies but states, without explanation, that "it is definitely the same call, which must be confirmed with a platform technician." (SE. 18). Costa Rica did not submit any evidence showing that a platform technician confirmed any of the locations allegedly established by the phone records.

Equally troubling is Costa Rica's failure to explain - or reconcile - the length of the telephone calls. Although the analysis includes the "Duration" of each call, the materials received from Costa Rica do not identify the applicable temporal measurement. We presume that the duration of the call is based on seconds, rather than minutes or hours. To conclude otherwise would render the phone records completely meaningless. Nevertheless, even if measured in seconds, many of the telephone calls overlap with each other. For instance, record 29 is a call from the 380 phone that begins at 9:48:41 and lasts "2524" - 42 minutes and 2 seconds. (SE. 14). If accurate, this record means that Mejia remained on the phone until approximately 10:30 a.m. However, record 30 shows a call from the 380 phone beginning at 9:52:58, and another - beginning before but listed after the prior call - commencing at 9:52:50 and lasting "509." (Id.). Record 36 shows another call from the 380 phone beginning at 10:09:52, and record 37 shows a call beginning at 10:11:25. (SE. 14-15). Since the call memorialized at record 29 continued until approximately 10:30 a.m., this Court

cannot determined how the individual holding the 380 phone could have commenced those calls. Costa Rica's failure to explain this information further undermines the value of the phone records.

Our determination that the phone records are not reliable is further confirmed by Nolan's flight records. Costa Rica contends that Nolan left San Jose, Costa Rica on March 6, 2005 aboard flight number CO1103 to Houston, Texas. (SS. 76, 84). That flight arrived in Houston at 7:04 p.m. (SS. 84). Because the flight would have lasted approximately 3 hours and 45 minutes, we must conclude that Nolan left Costa Rica shortly after 3:00 p.m.[9] Yet the telephone records for that date show dozens of calls to or from the 378 phone between 3:40 p.m. and 6:16 p.m. - the time in which Costa Rica places Nolan on a flight to Houston. (SE. 17 at R. 59 - SE. 18 at R. 72). In light of this conflict, we must conclude that either the phone records are erroneous or someone other than Nolan had possession of the 378 phone as of March 6, 2005. Both conclusions preclude this Court's reliance on the phone records as evidence of Nolan's actions on March 6, 2005, the date of Cohen's disappearance.

This is equally true of Costa Rica's use of the phone records to support its allegations as to Nolan's location on March 9-10, 2005. The evidence shows that on March 9, 2005 Nolan took flight number AA937 from Miami to San Jose. (SS. 84). According to the Costa Rican authorities, Nolan arrived at "3:27 H." (B. 78). Assuming this means 3:27 p.m., then Nolan was en route by 1:00 p.m. However, the phone

_____

[9]Costa Rica is on Coordinated Universal Time ("UTC") - 6. Accordingly, Costa Rica corresponds to the central time zone ("CST") during standard time and the mountain time zone ("MST") during daylight savings time.

records show that the individual in possession of the 378 phone made a call with a duration of "4" and received a call with a duration of "39" at approximately 2:49 p.m., the time during which Nolan was in flight. (SE. 28 at R. 19-20). Costa Rica contends that Nolan departed at 12:00 p.m. on March 10, 2005 aboard AA938 bound for Los Angeles. (B. 78). Yet the phone records show a series of calls to or from the 378 phone during the time Nolan would have been in flight. (SE. 34-36). In light of these conflicts, we have no choice but to conclude that the phone records are fundamentally flawed.

This Court's review of the phone records and the preliminary analysis submitted in support of Costa Rica's request reveals a number of flaws, inconsistencies, and unexplained conclusions. Accordingly, we find that the phone records are not competent evidence and cannot be relied on to support a finding of probable cause. See Fernandez-Morris, 99 F. Supp. 2d at 1366 (rejecting extradition request based on affidavit that "contains a variety of conclusory and speculative statements") (internal quotations omitted).

### B. Costa Rica's Narrative Evidence

Nolan also challenges Costa Rica's reliance on unsupported narrative statements. Our review of the formal extradition request, police reports, statements from the Prosecutors' Office, and other documents included in Costa Rica's submission reveal a number of unexplained conclusory statements. For instance, the extradition request states that Nolan "violently" took Cohen from the parking lot on March 6, 2005. The investigation summary prepared by Prosecutors' Office states that Nolan prepared the plan to keep Cohen "hidden in an isolated area of a solitary beach in the Atlantic

41

Zone" where he accomplished the "mission" of ending Cohen's life. (B. 5) Similarly, Prosecutor Rojas contends that Nolan and Mejia utilized their cell phones "according to plan, with the purpose of kidnapping [Cohen], sharing between both men the domain of the functional act" that they intended to execute on May 6, 2005. (SE. 2). Nolan characterizes this evidence as "unsupported and unsubstantiated narrative" and "hyperbole" that lacks any independent indica of reliability.

This Court must make an independent assessment of the evidence offered in support of an extradition request and determine if it is sufficient to sustain a finding of probable cause. *See, e.g. Glucksman v. Henkel*, 221 U.S. 508, 512, 31 S.Ct. 704, 705 (1911) ("[A] man is not to be sent from the country merely upon demand or surmise."); *In re Extradition of Lehming*, 951 F. Supp. 505, 514 (D. Del. 1996) ("In order to determine probable cause, a judge is to review the evidence presented and make an independent determination that the accused committed the crimes alleged."). Our review of the proffered evidence "cannot be a mere ratification of the bare conclusions of others." *In re Extradition of Ribaudo*, 2004 U.S. Dist. LEXIS 1456, *14 (S.D.N.Y. Jan. 30, 2004); *see also Giordenello v. United States*, 357 U.S. 480, 486, 78 S.Ct. 1245, 1250 (1958) ("The commissioner must judge for himself the persuasiveness of the facts relied on by a complaining officer to show probable cause. He should not accept without question the complainant's mere conclusion that the person whose arrest is sought has committed a crime."). Accordingly, we will not credit statements by the Costa Rican authorities that are unsupported and conclusory. *See, e.g. Fernandez-Morris*, 99 F. Supp. 2d at 1366-67 (finding affidavit containing a variety of conclusory

and speculative statements did not establish probable cause); *In re Mazur*, 2007 U.S. Dist. LEXIS 52551 at *71 (requiring "independent indicia of reliability" to support a probable cause finding). We will consider Costa Rica's contentions, both sworn and unsworn, to the extent they are supported by a statement or abstract of a statement from an individual with personal knowledge, business records, physical evidence, summaries of trial testimony, or any other corroborating evidence. *See id; see also Afanasjev v. Hurlburt,* 418 F.3d 1159, 1161-63 (11th Cir. 2005) (affirming magistrate judge's reliance on a bill of indictment containing summaries of victim statements prepared by Lithuanian investigators to support extradition on fraud charges even though the indictment was not prepared under oath).

## VII.   PROBABLE CAUSE ANALYSIS OF EVIDENCE OFFERED TO SUPPORT THE HOMICIDE AND KIDNAPPING CHARGES

Nolan contests the government's submission of evidence establishing probable cause for Aggravated Kidnapping. He argues that Costa Rica has no evidence that: (1) Nolan was with Cohen in the parking lot or that violence was used the morning of March 6, 2005; (2) that the vehicle Nolan rented in February 2005 was the same one that appears in the surveillance tape; (3) connecting Nolan to Mejia in March 2005; and (4) showing Nolan's whereabouts or activities upon his return to Costa Rica. Nolan also argues that the evidence submitted by Costa Rica "falls short" of establishing probable cause to believe that Nolan "kill[ed] . . . [w]ith treachery (killing by surprise) or extreme cruelty" as is necessary to extradite on the basis of Aggravated Homicide. Before reaching these arguments, we must resolve Nolan's claim that a finding of probable cause is precluded by the fact that "Mejia has never implicated Nolan in the kidnapping

and murder of Cohen at trial, sentencing, or anytime thereafter." This is pure speculation. Costa Rica did not submit any records from Mejia's trial, other than the final ruling sentencing him to twenty-seven years of imprisonment.

Contrary to Nolan's argument, we find that there is competent evidence, including the two surveillance tapes, that Nolan was with Cohen in the parking lot on the morning of March 6, 2005. Nolan argues that there is no reliable identification of him as the individual with Cohen in the hotel and shopping center parking lot. He also highlights conflicting evidence as to the time of the events memorialized in the videos. Finally, Nolan contends that the video evidence cannot be considered because Costa Rica did not include a copy of the surveillance tapes in the extradition packet. This Court may consider summaries of physical evidence, rather than the evidence itself. *In re Sainez*, 2008 U.S. Dist LEXIS 9573 at *46-47. Accordingly, Costa Rica's election to submit narratives describing the videos, rather than copies of the surveillance tapes, does not preclude a finding of probable cause.

There is a potential inconsistency regarding the videos and the time of Cohen's alleged abduction. Pinell, the head of security for the Multiplaza Shopping Center, stated that a video taken "at approximately 06:25 hours" shows a white 4Runner entering the parking lot and then "shows mister Cohen and Mc Callan as they walk into the parking lot, and after some time, it can be seen that the vehicle moves . . then it shows Cohen and MC Callan walking in the direction of the vehicle." (B. 56). However, Costa Rica also relies on a video that shows Cohen and Nolan having breakfast at the hotel at approximately 6:45 a.m. (B. 14). As summarized in the extradition request, "[m]inutes later, a video camera in the hotel parking lot showed Cohen and Nolan

approaching a white Toyota Four Runner." (*Id.*). This indicates that the kidnapping occurred at approximately 6:50 a.m. Pinell testified that these same events took place "some" time after 6:25 a.m. Accordingly, there is no direct conflict between the two accounts, and the evidence related to the parking lot video is sufficiently reliable to merit consideration. *See In re Sainez*, 2008 U.S. Dist. LEXIS 9573 at *55-56 (rejecting inconsistencies and conflicts as "not sufficient to negate the showing of probable cause."); *see also Quinn v. Robinson*, 783 F.2d 776, 815 (9th Cir. 1986) ("The magistrate does not weigh conflicting evidence and make factual determinations but, rather, determines only where there is competent evidence to support the belief that the accused has committed the charged offense.").

Nolan relies on *In re Okeke* to show that the identification of him is "unreliable and, standing alone, cannot support a finding of probable cause." 1996 U.S. Dist. LEXIS 22379 at *17. The star witness in *Okeke* initially identified the defendant as "Trudy," an individual whom she had met on four separate occasions. *Id.* Fifteen months later, she identified the defendant as "Citrago," another individual whom she had met on at least five separate occasions. *Id. at *17-18.* Because the government did not offer any evidence to support its contention that the second identification, unlike the first, was reliable, and the identification was not corroborated by other evidence, the Court found that the identification did not establish probable cause necessary for extradition. *Id. at *18-20.* These facts are not present here. The Costa Rican authorities also compared the video to Nolan's image from his Chicago Police Department rap sheet and concluded that the images were of the same person. (B. 18,

25-26). The copies of the photograph provided by the Chicago Police Department and included in the extradition packet provide a sufficient basis for that identification. A police report also includes the summary of an interview with Pinell, the head of security for the shopping center, "who confirms that the security video shows . . . Cohen, accompanied by Mc Callan, enter the parking area , walking towards the vehicle and apparently board it, to then leave the parking area in the vehicle." (B. 76).

Additional evidence supports the identification of Nolan as the individual in the parking lot video. Statements from two hotel employees place Cohen and Nolan together a few moments before the video. An earlier video shows Cohen and Nolan having breakfast at the Intercontinental on the day in question. (B. 14). Accordingly, unlike the facts before the *Okeke* court, there is more than a "flawed identification" to link Nolan and Cohen - and there is probable cause to believe that Nolan is the individual identified in the surveillance videos. *Id.* at *20; *see also In re Mazur*, 2007 U.S. Dist. LEXIS 52551 at *74-75 (rejecting identification "unduly suggestive line-up" by witness who was unable to offer independent description of the realtor on grounds that it "would never pass muster in this country").

Costa Rica has presented competent evidence that the 4Runner that appears in the surveillance tape is the same vehicle Nolan rented in February 2005. Nolan does not contest that he rented the 4Runner. There is evidence that Mejia drove the 4Runner while working at the Aurola Holiday Inn Hotel. (B. 78). Mejia received two tickets while driving the 4Runner, including one on March 5, 2005 - the day before the alleged kidnapping. (B. 81). Moreover, following the discovery of Cohen's body, investigators discovered the 4Runner in Mejia's possession. A 4Runner appears in the

surveillance video. Although the video does not show the vehicle's license plate, the Costa Rican authorities determined that the vehicle in the March 6, 2005 surveillance video "has the same characteristics" as the one rented by Nolan and routinely driven by Mejia. (B. 80). We have no reason to doubt this analysis.

The witness statements also establish a connection between Nolan and Mejia in March 2005. However, as Nolan argues in his opposition to the extradition request, "[s]imply being in the presence of people known to be associated with . . . crime is not a crime - at least, it is not the basis for the extradition request." *In re Mazur*, 2007 U.S. Dist. LEXIS 52551 at * 70. We must consider if there is adequate evidence of Nolan's role in the charged offenses.

Costa Rica has put forth evidence regarding Breska's motives. There is evidence that Cohen lost approximately $7 million of Breska's money. Cohen believed Breska was "capable of putting [his] life in danger" and informed his attorney that Breska would be "the person responsible" should anything happen to him. Additional evidence shows that Breska introduced Nolan, then using the alias Matthew McCall-Oppenheimer, to Cohen, and that Nolan, Cohen and Breska met in Florida on or around February 18, 2005. Moreover, there is competent evidence that Nolan was engaged in efforts to recover Breska's money in January 2006. Accordingly, at a minimum, there is probable cause that unbeknownst to Cohen, Nolan was engaged in "asset recovery" work for Breska.

What is lacking is evidence that Breska retained Nolan as a "hired-killer"; that Nolan planned to kidnap and murder Cohen; that Nolan was aware of, let alone ordered, Mejia's actions; or that Nolan engaged in any violent act. Costa Rica seeks to

47

extradite Nolan for trial on the charge of Aggravated Kidnapping in violation of Article 192, paragraph 2 of the Penal Code. This charge may be brought against a person who "deprive[s] another of his personal freedom . . . [u]sing acts of violence or to satisfy revenge or resulting in serious harm to the victim's health." (B. 7, 96). Nolan interprets the statute to require that the deprivation of personal freedom be accompanied by each of the four aggravating factors. Thus, he argues that Costa Rica's submission is insufficient because it does not include any evidence that Cohen was an ascendant, descendant, spouse, sibling or public official; that his kidnapping occurred through "abuse of authority;" or that Cohen's captivity lasted more than five days. The government contends that Nolan's interpretation of the statute leads to a "preposterous result." We agree. The government's reading of the statute - namely that the offense of Aggravated Kidnapping under Article 192, paragraph 2 "occurs when a person deprives another of his personal freedom . . . using violence or to satisfy revenge or resulting in serious harm to the victim's health" - is a more reasonable interpretation.

Costa Rica has shown that on morning of March 6, 2005 or sometime shortly thereafter Cohen was deprived of his personal freedom and held against his will. There is evidence that Nolan and Cohen had breakfast together at approximately 6:25 a.m. on March 6, and that Cohen had no intention of traveling to Limon at that time. Costa Rica contends that Nolan and Mejia "violently" forced Cohen into the 4Runner "depriving him of his freedom." However, Costa Rica did not submit any physical evidence, witness statement or other evidence demonstrating that Nolan - as opposed to Mejia - used violence against Cohen or took any action that deprived Cohen of his freedom. In fact, Costa Rica's evidence shows someone other than Nolan was responsible for Cohen's

48

confinement in Limon. During the period of captivity, Cohen repeatedly told his daughter that "Breska" was behind his abduction. (B. 60-61). Moreover, Mejia has already been convicted of this crime.

Cohen's phone calls to his daughter, Alisha, establish that by March 7, 2005 Cohen believed his life was in danger. Costa Rica asserts that Nolan was in Paris at this time, but nevertheless seeks to hold him accountable for Mejia's actions. The extradition request states that "by tracking the telephone calls, it is determined that there is constant communication between [Mejia] and Nolan the day Cohen [d]isappeared and in the hours close to his death." Costa Rica also contends that "the telephone records indicate Nolan and Mejia communicated on 09 March 2005, during the time when Cohen was being held captive by [Mejia], in effect coinciding with the prior and necessary coordination for traveling to the Atlantic zone to execute the plan to end the victim's life." (B. 16). As discussed above, our review of the telephone records reveals too many flaws to substantiate this conclusion. Costa Rica also contends that "Nolan ordered cruel treatment and physical aggression in general over Cohen during his captivity, which was demonstrated in the report rendered by . . . Dr. Luis Solorzano." (B. 16). Dr. Solorzano's report states that Cohen died by violent means. However, Dr. Solorzano does not identify Nolan as the perpetrator, or reveal any physical evidence linking Nolan to the murder. Aside from Prosecutor Rojas' unsupported allegation, there is no indication that Nolan ordered "cruel treatment," or that Nolan was even aware of Cohen's captivity. Moreover, there is no evidence of a plan between Mejia and Nolan to end Cohen's life.

Finally, Costa Rica relies on Nolan's efforts to cover up his involvement in the

49

kidnapping as evidence supporting probable cause. Nolan submitted his wife's medical records to show that she suffered a life threatening condition in early March 2005. Nolan argues that these records explain his sudden and unexpected departure on March 6, 2005. The medical records include a physician's note stating that on March 6, 2005, she made an "[e]mergency call to husband who was overseas to come home immediately." There is no basis for this Court to assume that Nolan did, in fact, return to Chicago after receiving that call. Furthermore, under the governing evidentiary standard, we cannot rely on this evidence to contradict Costa Rica's assertion that Nolan traveled to Paris, New York and Miami before returning to San Jose on March 9, 2005. *See In re Ortiz*, 444 F. Supp. 2d at 884 ("[T]he defendant's right to challenge the evidence introduced against him is quite limited. He can offer evidence that explains the requesting country's proof, but he cannot submit evidence that contradicts it.").

Costa Rica has submitted credible evidence, in the form of statements from Umana and the fifth floor receptionist, that Nolan returned to the Intercontinental around 10:00 a.m. on March 6, 2005. Costa Rica's submission also includes several witnesses statements and emails that suggest Brenes, rather than Nolan, removed the documents from Cohen's room. Nevertheless, we will credit Costa Rica's evidence and assume that Nolan returned to the hotel and removed documents from Cohen's room. *See In re Sainez*, 2008 U.S. Dist. LEXIS 9573 at *55-56 (holding that inconsistencies that are not sufficient to negate the showing of probable cause "raise issues which are appropriate for determination at full trial" in the requesting country). However, this fact still does not show that Nolan acted to "deprive [Cohen] of his personal freedom."

Relying on the totality-of-the-circumstances approach, the government argues

50

that the phone records, witness statements, rental contract for the 4Runner and videotape evidence establish "probable cause to believe that Nolan is the author of the crime or participated in the crime of Aggravated Kidnapping." This is admittedly troubling evidence. Costa Rica seeks extradition for Aggravated Kidnapping. To support this charge, Costa Rica relies on unsupported narrative statements that do not contain sufficient information to allow this Court to independently determine probable cause. See In re Ribaudo, 2004 U.S. Dist. LEXIS 1456 at *16-17 (decision of Italian appellate court affirming conviction did not conclusively establish probable cause "since the underlying evidence has not been made available, [and] the Court cannot make an independent determination concerning whether there is probable cause to believe that [realtor] committed the crimes charged."); see also Illinois v. Gates, 462 U.S. 213, 239, 103 S.Ct. 2317, 2333 (1983) (reasoning, in connection with the application of a totality-of-the-circumstances test for probable cause, that "[s]ufficient information must be presented to the magistrate to allow that official to determine probable cause; his actions cannot be a mere ratification of the bare conclusions of others.").

This Court is not permitted "to simply hand over a United States citizen on the word of a prosecutor, coupled with conclusory allegations and unsubstantiated, unreliable evidence." In re Mazur, 2007 U.S. Dist. LEXIS 52551 at *82. Accordingly, after carefully considering the evidence submitted by Costa Rica, and taking into account the significant number of inconsistencies within that evidence, we must ultimately conclude that it is insufficient to "cause a person of ordinary prudence and caution to consciously entertain a reasonable belief" of Nolan's guilt on the charge of Aggravated Kidnapping. In re Guillen, 1991 U.S. Dist. LEXIS 21839 at *22 (citation

omitted).

The absence of corroborating evidence also requires the denial of Costa Rica's request to extradite Nolan on the charge of Aggravated Homicide. The Costa Rican Penal Code states that twenty to thirty-five years of prison "shall be imposed on any person who kills," "[w]ith treachery (killing by surprise) or extreme cruelty," "[f]or preparing, facilitation, executing or hiding another crime . . ." or "[f]or price or promised remuneration," or other circumstances that are not present here. Based on the plain language of this statute, we cannot grant the extradition request unless we find probable cause that Nolan killed Cohen.

Costa Rica has not submitted sufficient evidence that Nolan is a "person who kills." The request to extradite on the homicide charge is supported almost entirely by conclusory statements by various Costa Rican authorities who lack personal knowledge of the events at issue. This is not sufficient evidence to support a finding of probable cause. *See In re Extradition of Ernst*, 1998 U.S. Dist. LEXIS 10523, *28 (S.D.N.Y. July 14, 1998) (noting that materials submitted in support of an extradition request "must set forth facts from which both the reliability of the source and probable cause can be inferred."). As his counsel observed in oral arguments, "there is not a single witness who puts Matt Nolan anywhere near this murder." There is no physical evidence placing Nolan at the cabin in Limon, where Cohen's murder allegedly took place, or near the Chirripo River where Cohen's body was discovered. There is no physical evidence suggesting that Nolan tortured Cohen or engaged in any actions that caused his death. Accordingly, for the reasons set forth above, we also decline to issue a certificate of extraditability on the charge of Aggravated Homicide.

## VIII. SUMMARY AND ANALYSIS OF EVIDENCE OFFERED IN SUPPORT OF USE OF A FALSE DOCUMENT CHARGE

### A. Summary of Competent Evidence

This Court must also determine if there is probable cause to sustain the charge of Use of a False Document. Costa Rica contends that "[a]s part of Nolan's ruse and his attempt to recover Breska's money," Nolan, "using false British passport number 700057888" issued to Matthew Francis McCall, opened an account at Banco Promerica in Pavas, San Jose. (B. 3-4, 51). Costa Rica further contends that "[t]o demonstrate this offense, there are documents signed by Nolan, using the false name Matthew Mc Call." (B. 10). It does not appear that these signed documents are included in the extradition packet.

The initial extradition packet includes an application to open an account at Banco Promerica in the name of "Matthew Francis McCall." (B. 48). The identity of the individual who completed the application is not known. The application is not signed, and the evidence before this Court does not show that the account was actually opened. On the application, the account holder is identified as "Matthew Francis McCall." The application states that McCall resides in London, his identification number is "700057888," and his phone number is "006/378-1326." (*Id.*). The application also identifies "mccall-opp@web.de" as the account holder's email address. This is the same email address used by Nolan to correspond with Cohen in February and early March 2005. (SS. 67-71). There is also evidence connecting the phone number identified on the Banco Promerica application to Nolan. During the investigation conducted by Costa Rican authorities "it was demonstrated that Douglas [Mejia] gave

Nolan cellular telephone line 378-1326, which he himself had purchased from Alexis de Jesus Cervantes Chaves, who declared at trial to this effect." (B. 16).

The application is followed by a copy of British Passport number 700057888, issued to Matthew Francis McCall, and a copy of a UK driving license, also in the name of Matthew Francis McCall. The British Embassy in Costa Rica verified that the passport is fraudulent. (B. 47). It is reasonable to conclude that Nolan is the individual whose photograph appears on those documents. The government contends that a stamp on the copy of McCall's passport establishes that it was received by Banco Popular on March 3, 2005. (B. 51). Our review of the stamp does not lead to that conclusion. Rather, we find that the stamp appears to be from "BANCA ____" and may indicate that the document was "revised by" an unidentified entity or individual on March 3, 2009 - or possibly March 3, 2005. (*Id.*).

Costa Rica provided a witness statement that corroborates Nolan's use of the false passport. As summarized by the Costa Rican authorities, Bolanos stated that on March 4, 2005 Cohen and "Mc Callan opened an account with Banco Promerica in Pavas, were assisted by Alejandra Cerdas, the account was opened in the name of Mc Callan because he was going to transfer $13,000,000." (B. 57). Bolanos is identified as a "contacto" on the application. (B. 48).

The final piece of evidence offered to support the charge of use of a false document is included in the DOJ Response. The FBI conducted an interview with Michelle Hall, Cohen's secretary, who reported that, during a telephone conversation with Cohen, "he handed the phone over to Oppenheimer, who indicated that she would be receiving two wire transfers, one for $10,000 and another for $12.5 million dollars

which never arrived." (SS. 75). Hall also reported that she received a call on March 7, 2005 from Nolan's assistant, Walter, "stating difficulties with the wire transfer." (SS. 75).

## B.  Nolan's Arguments Against a Finding of Probable Cause

Nolan argues that "only incompetent and unreliable evidence" supports the charge of use of a false document. Nolan points out that the bank application is undated, does not include a bank account number, and does not bear the signature of Matthew McCall - or any other individual. Nevertheless, the application includes Nolan's fake passport, e-mail address and telephone number. This is, in and of itself, sufficient to establish probable cause.

Further, Costa Rica's contentions are supported by Bolanos' statement. According to Bolanos, Cohen informed him, over lunch on March 4, 2005, that he accompanied McCall to Banco Promerica that day and opened an account with the assistance of Alejandra Cerdas. Although Nolan correctly characterizes Bolanos' statement as hearsay, "hearsay testimony is often used in extradition hearings." *Bovio*, 989 F.2d at 259 (affirming extradition based on hearsay testimony) (citation omitted). Moreover, the fact that Costa Rica has not provided a statement from a bank employee or police report reflecting an investigation into the Banco Promerica incident does not negate our finding of probable cause. *See, e.g. In re Extradition of Strunk*, 293 F. Supp. 2d 1117, 1121 (E.D. Cal. Nov. 12, 2003) ("The requesting country is not required to submit all its evidence, and the district court considers only probable cause, not whether the evidence is sufficient to convict.") (quotation omitted)

Nolan also contends that the statement must be disregarded because "Bolanos

provides the wrong date - a key fact in the case and no minor inconsistency - for the alleged bank visit." Bolanos stated that Nolan visited Banco Promerica on March 4, 2005. The application itself is not dated. However, the extradition request and Prosecutor's Summary both states that Cohen and Nolan visited Banco Promerica on March 3, 2005. (B. 37, 10). This inconsistency is troubling. If Bolanos statement were the only evidence supporting this charge, we would give greater credit to Nolan's argument. However, the record before this Court includes an application identifying passport number 700057888 and phone number 006/378-1326, as well as a copy of the false passport. This is sufficient to establish a reasonable belief that the passport belongs to Nolan, and that Nolan used the passport in connection with the bank application.

## IX.    FINDINGS AND CONCLUSIONS

The attorneys in this case have zealously represented their clients and are to be commended for their efforts. Our determination is not a criticism of the Assistant United States Attorney who handled this case on behalf of the government. In the end, our decision is based on the excessive amount of sheer speculation, inconsistent statements, and typographical and/or translation errors found in Costa Rica's submission. After a careful and repeated review of the materials presented in support of extradition, this Court could only guess as to Nolan's role in the events that transpired after 6:45 a.m. on March 6, 2005. Accordingly, we could not find a fair probability that Nolan committed the offenses of Aggravated Kidnapping and Aggravated Homicide.

For the reasons set forth above, this Court makes the following findings of fact

and conclusions of law:

1.　This Court is authorized to conduct an extradition hearing under 18 U.S.C. § 3184.

2.　This Court has personal jurisdiction over Matthew Francis Nolan and subject matter jurisdiction over this case.

3.　There is currently in force an extradition treaty between the United States and the Republic of Costa Rica.

4.　Matthew Francis Nolan, a citizen of the United States and Great Britain, has been charged with the crimes of (1) Use of a False Document, in violation of Article 365 of the Costa Rican Penal Code, (2) Aggravated Homicide, in violation of Article 112, paragraphs 3 and 7 of the Penal Code, and (3) Aggravated Kidnapping, in violation of Article 192, paragraph 2 of the Penal Code.

5.　These charges are also crimes under the laws of the United States.

6.　These charges constitute extraditable offenses within the meaning of the Treaty.

7.　The Republic of Costa Rica seeks extradition of Matthew Francis Nolan for these charges.

8.　This Court has been presented with sufficient evidence to compel a finding of probable cause to extradite Matthew Francis Nolan to Costa Rica for the charge of Use of a False Document.

9.　Costa Rica did not present sufficient evidence to allow for a finding of probable cause to extradite Matthew Francis Nolan for the charges of Aggravated Homicide and Aggravated Kidnapping.

Based on the foregoing, this Court finds and concludes that Matthew Francis

Nolan is extraditable for the offense of Use of a False Document for which extradition

was requested, and there is probable cause to certify this finding to the Untied States

Secretary of State, as required under 18 U.S.C. §3184.  This Court has not been

presented with sufficient evidence to compel a finding of probable cause to extradite

Matthew Francis Nolan to Costa Rica on the remaining charges of Aggravated

Homicide and Aggravated Kidnapping.

IT IS THEREFORE ORDERED that a certified copy of this Memorandum Opinion and Order and Certification of Extraditability, along with all formal extradition documents received into evidence, a certified copy of all testimony taken at the hearings, and a copy of all memoranda of law filed on the issue of extradition be delivered by the Clerk of the Court of the Northern District of Illinois to the Assistant United States Attorney for this District for transmission to the United States Secretary of State.

IT IS FURTHER ORDERED that Matthew Francis Nolan remain in the custody of the Metropolitan Correctional Center pending final disposition of this matter by the Secretary of State and the arrival of agents of the Republic of Costa Rica for the purpose of his extradition to Costa Rica to face trial on the charge of Use of a False Document.

ENTERED:

**MICHAEL T. MASON**
**United States Magistrate Judge**

DATED: August 31, 2009